UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,
Docket No. 1:23-cv-03445-CM:

- against -                                         :          Case No. 21 CR 760 (CM)

                                                    :

PUNEET DIKSHIT,                                     :

                                                    :

          *Defendant*.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## ADDENDUM TO 28 U.S.C. 2255 HABEAS CORPUS PETITION

Filed by Petitioner Puneet Dikshit

**Preliminary Statement:**

The United States Supreme Court has recognized that the Sixth Amendment right to Counsel includes a "correlative right to representation that is free from conflicts of interest." Wood v. Georgia, 450 U.S. 261, 271, 101 S.Ct. 1097, 67 L Ed. 2d 220 (1981); Smith v. Lockhart, 923 F 2d. 1314, 1320 (8th Cir 1991).

The petitioner now files a 2255 petition requesting relief given his Counsel labored under an undisclosed conflict of interest that resulted in adverse effect on Counsel's performance and consequent ineffective assistance. The instant claim is grounded on the fact that at no point pre-sentencing was the petitioner advised that the lead prosecutor from the Department of Justice is the son of one of the lead partners of the petitioner's law firm, thereby exerting much greater than normal access to and influence on the defense Counsel.

As part of the right to counsel under the Sixth Amendment, a defendant must be given a "fair opportunity" to retain counsel of his choosing. At the same time, the court has a duty in a criminal case to prevent an actual conflict of interest that undermines the integrity of the court proceedings. *Wheat v. United States*, 486 U.S. 153, 160, 108 S. Ct. 1692, 1698 (1988) (noting the nature of judiciary's obligation in ensuring the defendant's conflict-free representation).

An attorney's conflict of interest in the representation of a client is addressed in the first instance in the New York Rules of Professional Conduct (RPC) 1.7. RPC 1.7 restricts an attorney's ability to represent a client

when there is "a concurrent conflict of interest." It states that "[a] concurrent conflict of interest exists" if there is a "risk that lawyer's professional judgement on behalf of a client will be adversely affected by the lawyer's own financial, business, property or personal interests."

Most importantly, RPC 1.7 mandates that even where there is only a risk of a conflict of interest, the attorney may proceed with the representation as long as "affected client gives informed consent, confirmed in writing." RPC 1.7 must be considered in tandem with New York DR 5-101 which in part states that the most obvious conflicts of interest are those in which the lawyer's personal interests clash with those of the client. DR 5-101 expressly prohibits the creation of such a situation: "Except with the consent of the client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgement on behalf of his client will be or reasonable may be affected by his own financial, business, property or personal interests."

Obviously, the client's rights to full and disinterested service by his lawyer will be meaningless if the lawyer must choose between his own and the client's interests. In criminal cases, "special vigilance is required because an attorney's divided loyalty (to a third party or his own personal interests) can undermine a defendant's Sixth Amendment right to effective assistance of Counsel" Wheat, supra.

**Factual Background:**

Prior to his arrest on November 10th, 2021, petitioner had retained the law firm Kramer, Levin, Naftalis & Frankel "("KLNF") with an explicitly stated intent to self-report his offense conduct (insider trades conducted on September 14th and 15th 2021) to the SEC and DOJ.

On November 10th, the day of his arrest, the petitioner and his Counsel were made aware that the prosecutors on the case were AUSAs Joshua Naftalis and Matthew Podolsky. AUSA Naftalis played the lead role in engaging and communicating with the defense counsel.

AUSA Joshua Naftalis is the son of Gary Naftalis, one of the four lead partners at KLNF, and had much greater than normal access to and influence over the law firm and the defense counsel. Even within a partnership-based structure of a law firm, the prosecutor's father is a direct professional superior to the defense counsel and in a position of influence and authority with respect to Counsel.

This access and influence aren't just theoretical. This was more than the standard professional or social relationships that exist between lawyers practicing within the same jurisdictions. As an example, the prosecutor occasionally worked out of the KLNF offices in midtown Manhattan. Most prosecutors do not work from the offices of the law firms of the defendants they are trying to prosecute. This was unusual and much greater than normal access and unstated influence between prosecutor and Counsel.

This directly impacted Counsel's representation throughout the time Counsel represented the petitioner. Counsel was highly deferential to prosecutor, unwilling to push back on or call out prosecutor's arguments even when they were blatantly misleading and/or flawed. Counsel actively worked with prosecutor on deploying tactics that were clearly detrimental to the defense of the petitioner. Counsel made blatant errors that, at best, clearly displayed the half-heartedness with which Counsel approached the defense, or at worst, were intentionally callous. [See following section for specific examples].

These decisions and errors made by Counsel were influenced by the Counsel's attempt to protect their own personal and professional interests, namely the privileged relationship they had with the prosecutor, the son of their law firm's lead partner. Counsel consciously chose not to take steps that would be in the best interest of the petitioner but would have required them to push back to the prosecutor. In addition, Counsel continued to entertain and engage in discussions with the prosecutor that were not only detrimental to the petitioner's case, but also went against the defendant's clearly stated reservations and opinions.

**Legal Argument:**

The arguments stated above are backed by evidence as elaborated later in this motion. The defendant is well aware of the high bar Courts place on these arguments. As per *U.S. v. Nicholson*, 475 F3d, 241, 249 (4th Cir. 2007) to establish conflict of interest, a petitioner must show that his lawyer had an "actual conflict of interest" and it adversely affected lawyer's performance.

There is ample precedence where courts have clearly defined what constitutes actual conflict. To constitute actual conflict, the conflict must have "affected counsel's performance - as opposed to a merely theoretical division of loyalties" *Mickens v. Taylor*, 535 U.S. 162, 171.

"An actual conflict exists only if counsel was forced to make choices advancing interests to the detriment of his client" *Workman v. Mullin*, 342 F3d 1100, 1107 (7th Cir. 2003).

Importantly, Courts have ruled that an "actual conflict" is not separate from "adverse effect," rather it is defined as one which adversely affects lawyers' performance [*Earp v. Ornoski*, 431 F3d, 1158, 1183 (9th Cir 2005) (quoting Mickens U.S. at 172 n.5).

Given these rulings, the actual conflict is presumed once petitioner identifies "an actual and demonstrable adverse effect." Winfield, 460 F3d. at 1039 (quoting *U.S. v. Flynn*, 87 F3d. 996, 1001 (8th Cir. 1996).

To prove adverse effect, the courts have also leveraged a three-part standard that a petitioner needs to satisfy with a preponderance of evidence. Pegg, 253 F3d at 1228; Quince, 360 F3d. 1264:

1) Identify a plausible alternative defense strategy or tactic that a counsel may have pursued. Importantly, as per Gambino, 864 F2d at 1070, this alternative strategy need not "have been successful if it had been used" but must have "possessed sufficient substance to be a viable alternative."

2) Establish that the alternative strategy/tactic was objectively reasonable under the facts of the case known to attorney

3) Establish that the defense counsel's failure to pursue strategy/tactic was linked to the actual conflict

See also *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (citing *Cuyler v. Sullivan*, 446 U.S. 335, 344 (1980)) (noting that an "actual conflict of interest adversely affecting lawyer's performance renders assistance ineffective); see also id. at 692 (citing Fed R. Crim P. 44 (c)) (In Cuyler, the Court held that prejudice is presumed when counsel is burdened by an actual conflict of interest. In those circumstances, counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties. Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests. Given the obligation of counsel to avoid conflicts of interest and the ability of trial courts to make early inquiry in certain situations likely to give rise to conflicts, it is reasonable for the criminal justice system to maintain a fairly rigid rule of presumed prejudice for conflicts of interest."). See generally Bruce A. Green Criminal Law (stating that "the constitutional right to competent counsel rarely affords a remedy when a criminal defense lawyer does little more than encourage the client to plead guilty. Moreover, as a normative matter, because constitutional decisions demand so little from criminal defense lawyers, the case law tends to undermine the dictates of the ethics codes rather than reinforce them."); Wayne R. Lafave Et Al., Crim Proc. 11.9(d)(3d ed. 2013)

To summarize, the Cuyler opinion clearly establishes that if a petitioner can show that an actual conflict existed that adversely affected lawyer's performance, courts presume prejudice, the second component of the Strickland test, and there is no need to demonstrate that, but for the lawyer's conflict, the sentencing outcome would be different.

The determination of adverse interest is objective and is concerned with the appearance of impropriety. See Rome 19 F3d at 58. Courts have ruled that appearance of impropriety is a persistent theme in disinterestedness cases and undivided loyalty is central to disinterestedness as well. This is also stated in the New York Code of Professional Responsibility, Canon 9. See Granite, 219 B.R. at 34. Several Courts have ruled that disinterestedness requirement was intended to "prevent even the appearance of conflict

irrespective of the integrity of the person or the firm under consideration." Martin, 817 F 2d. at 180.81 (quoting, Codesco, 18 B.R. at 999.). The court in Rancourt, 207 B.R. 338, 359 (Bankr. D.N.H. 1997), went so far as to say that section 327(a) is designed to limit even appearances of impropriety to the extent reasonably practicable, doubt as to whether a particular set of facts gives rise to a disqualifying conflict of interest normally should be resolved in favor of disqualification." In fact, some courts regard counsel's failure to avoid conflicts of interest as evidence of counsel's lack of disinterestedness (See re Spanjer Bros., Inc), 191 B.R. 738, 753.

There are multiple examples of an adverse effect on Counsel's performance throughout the case where the Counsel willfully ignored a reasonable alternative strategy or failed to refute the prosecutor's flawed statements. These actions were influenced by the Counsel's desire to protect their privileged relationship and be deferential in every possible way with the lead prosecutor.

**Point 1: Not sharing evidence of petitioner's immediate remorse and resulting actions taken to self-report, enabling prosecutor to present a flawed narrative that adversely influenced the Court**

The petitioner has never tried to minimize the seriousness of his offense conduct. In fact, the petitioner regretted his offense immediately after conducting it. So much so that within a day of his offense conduct, petitioner began seeking out lawyers and within 4 days, reached out to a law firm (not KLNF) named Ford O'Brien with the explicit intent of self-reporting. In his first outreach to Ford O'Brien through the law firm's website, sent on September 19th, 2021 (4 days after offense conduct), he wrote "I wanted to speak to someone about reporting myself to the SEC for a potential insider trading violation"

Throughout the next few weeks, he repeated his strong desire to self-report, driven by his immense remorse and regret for his actions. This was evidenced in his communications with Ford O'Brien where, between September 19th and October 10th, 2021, the petitioner had multiple conversations and exchanged multiple emails with Ford O'Brien expressing his resolve to self-report.

On September 29th, he sent multiple examples of how people had self-reported in the past.

Ford O'Brien warned the petitioner that this would be pursued by the Department of Justice as a criminal case. Ford O'Brien also kept suggesting that the petitioner should not self-report and instead wait to see if he is approached by the SEC. Yet, the petitioner was resolute in self-reporting and in fact sent case examples of people who had self-reported in the past. Additionally, to show the genuine and deep remorse the petitioner had, the Court could have seen the specific mails he sent to Ford O'Brien.

On October 6th, he wrote: "*This has been the worst, most irresponsible decision I have made... I have destroyed my future and that of my family...hence I am thinking of just going to them [SEC]*"

On October 10th, he wrote: "*I understand that given the brands involved in my case, the attorney general may still pursue criminal proceedings but that is anyway likely even if we wait for the SEC to come to us.... My guilt for what I have done to my family, my colleagues, my children is consuming me entirely and I feel this [self-reporting] is both a safer option, and a chance for me to, in a very small manner, redeem myself*".

Through this time, Ford O'Brien forcefully dissuaded him from self-reporting while they also got up to speed with the offense conduct. However, the petitioner was strongly in favor of self-reporting and hence sought alternative counsel which led him to retaining KLNF on October 15th.

KLNF agreed with the petitioner's desire to self-report but also informed him of the potential impact on his H1B immigration Visa status for him and his spouse (though they never discussed the possibility of mandatory deportation). Despite this, petitioner was unwavering in his resolve to self-report and discussed specific next steps with Counsel. He also sought time to now inform his wife of the offense conduct and retain an immigration attorney to protect his wife's immigration status. However, while he was doing this, he was arrested.

Reasonable alternative strategy: Given the context above, a reasonable alternate strategy/tactic for defense Counsel would have been to show the Court that the petitioner's remorse was immediate and not just after his arrest. It was reflected in his actions right after the offense conduct and not just in words on the day of entering the plea. The petitioner was not just remorseful, not just accepted responsibility for his actions, but was also proactively working on self-reporting and presenting himself to the mercy of the Court, despite getting contrary advice from the law firm he retained initially.

This was backed by evidence. Petitioner's emails to Ford O'Brien reflected his deep remorse and his desire to self-report. The petitioner was willing to waive his attorney client privilege with Ford O'Brien to share this evidence. The petitioner repeatedly expressed his desire to present this evidence to the Court but KLNF did not act upon this strategy.

Again, as cited earlier, as per Gambino, 864 F 2d at 1070, this alternative strategy need not "have been successful if it had been used" but must have "possessed sufficient substance to be a viable alternative." Would it not have been reasonable for KLNF to present to the Judge how the petitioner's remorse was just mere words at an allocution or sentencing hearing but was actually represented in his immediate actions after the offense conduct and his desire to self-report and his active push in doing so? Would this not have helped diminished the perception of guilt in the mind of the Court? As per Sullivan 446 U.S. at 349, "failure

to diminish perception of guilt" is also evidence that points towards diverging interests. This was exactly the case here.

Failure to pursue influenced by Conflict: However, KLNF not only failed to deploy this strategy but on the contrary, repeatedly failed to argue against or to correct obvious flawed and misleading statements made by the lead prosecutor, both in the sentencing memo and on the day of sentencing, regarding the petitioner's actions prior to his arrest.

As an example, at sentencing, prosecutors stated "The petitioner reached out to lawyers once he knew he was being investigated." This was patently false. Petitioner had reached out to lawyers within 4 days of his offense conduct, well before any investigation was started by any agency regarding any trades, and certainly well before the petitioner was made aware of any investigation. KLNF knew this and never objected, clarified, or pre-emptively addressed it in any memo, letting the Judge get influenced by a false argument designed to make the petitioner look like a guilty criminal trying to shore up his defenses. This wasn't farther from the truth. The petitioner was not a guilty person trying to shore up his defenses but a highly remorseful one trying to accept responsibility and self-report his crime.

In another example, the prosecutors repeatedly referenced a google search made by the petitioner on October 7th for "Rajat Gupta's Lawyers" as a sign of the petitioner being aware of his guilt and trying to protect himself. The petitioner was indeed aware of his guilt but wasn't trying to protect himself. He was remorseful and was searching for a law firm (that led him to KLNF) that would agree with his desire to self-report, given Ford O'Brien was dissuading him from doing so at the time. Both KLNF and the prosecution knew this, but KLNF never objected to this portrayal and presented the facts that would have shown the petitioner's actions as being focused on admitting responsibility much before his arrest.

This harmed the petitioner. Again, as per Sullivan, 446 U.S. at 349, diverging interests can be shown by "...*failing to diminish the Jury's [or Judge's] perception of [petitioner's] guilt.*"

Why did KLNF not deploy this strategy? Why did they not inform the Judge of the petitioner's immediate actions to self-report? Why did they not present the supporting evidence? Why did they not attempt to diminish the perception of guilt the the prosecution was trying to create through their flawed statements? It was because it would have required them to call out, challenge, and counter the lead prosecutor head on. It would have meant showing how the prosecution was intentionally presenting a partial, biased, flawed picture of the petitioner's actions instead of all the facts. It would have made them get into an argument head-on with the prosecutor. Infact, at no point through the entire trial, not a single time, did the defense counsel ever challenge anything the prosecution suggested or stated, despite several similar flawed statements being made. This was because they wanted to protect their own interest. They wanted to protect

the privileged relationship they had with the lead prosecutor, who was in a position of perceived influence given he is the son of the lead partner at the Counsel's law firm. They didn't want to get confrontational with the prosecutor by calling out clearly misleading statements. The prosecutor was doing his job. The defense counsel was not.

These actions meet the three-part standard required to establish adverse effect where the defense counsel failed to deploy a viable alternative strategy which was objectively reasonable given the facts of the case as it would have required them to forcefully correct/oppose the prosecutor with whom they enjoyed a privileged relationship.

**Point 2: Engaging with prosecution to have petitioner sign final order of removal that not only lacked any benefit for petitioner but was in fact used to justify a lengthier sentence**

In mid-March, weeks before the sentencing, AUSA Naftalis reached out to KLNF offering to have Immigration & Customs Enforcement (ICE) issue a Final Order of Removal ("Order") for the petitioner to sign. This action was positioned to the petitioner by KLNF as a "great courtesy being done by the prosecution."

Over the next two weeks leading up to the sentencing, KLNF spent hours on the phone insisting that the petitioner sign this Order, stating that the prosecution was "only looking out" for the petitioner. The supposed benefit to the petitioner was far lesser time in ICE custody after the end of the petitioner's sentence, which is factually inaccurate. In fact, signing the order not only lacked any benefit for the petitioner was detrimental to him in multiple ways.

Counsel failed to inform the petitioner that the First Step Act (FSA) clearly has only one category of inmates' ineligible to apply earned credits towards early release. This category is non-citizens who have signed a Final Order of Removal. As stated in the FSA "non-citizens who are subject of a Final Order of Removal are ineligible to apply any earned time credits towards early release." Signing the order would have literally extinguished any and every possible chance that the petitioner would have ever had to earn and apply time credits.

What's worse, while Counsel insisted that signing such an order would not impact the Petitioner's case in any way, the prosecution was intending to use this Order signed by the petitioner as an argument to justify a lengthier sentence. In their sentencing memo in the "Collateral Consequences" section, the prosecution argued that the petitioner's signing of this "Judicial order of removal" should be a reason to not consider his ICE detention as a consequence and hence give him a longer sentence.

The petitioner had also consulted his immigration lawyers and made them speak to KLNF to share how signing the order also makes little to no difference in the length of time spent in ICE custody. Despite this, KLNF kept insisting the petitioner sign the order. Signing the order would have eliminated all eligibility for FSA. It was being directly cited by the prosecution as a justification for a longer sentence. Immigration lawyers were advising that it has no benefit in terms of reducing ICE custody. Lastly, the petitioner always had the option to sign it while in BOP custody as is done as a well-established practice across Federal prisons. Yet KLNF kept insisting that the petitioner sign something that was patently detrimental to his case.

KLNF knew or should have known the above. Despite petitioner's clearly stated reservations (and in fact confusion as to why KLNF was insisting on this), Counsel continued to engage with and entertain discussions with the prosecution on the Order. To the extent that prosecution actually had a copy of the Order drafted by ICE for the petitioner to sign.

This insistence continued even after the prosecution filed their sentencing memo that explained how they were intending to use the Order as a justification for a longer sentence. The petitioner even called this out, writing to his Counsel on March 26th and highlighting how the prosecution "played us" by presenting this option to the defense and then using it as a option to justify a longer sentence.

Though the petitioner eventually did not sign the order, the damage had been done. The petitioner's arguments requesting leniency due to the lengthy ICE detention he faced were negated. The prosecution played KLNF and created a Catch-22 situation. On the one hand, if petitioner signed, the prosecution used that as a reason to ask for a lengthier sentence arguing he no longer faced lengthy ICE detention (which is untrue - signing the order in advance makes little to no difference in length of ICE detention and would in fact also made the petitioner ineligible to apply FSA credits). On the other hand, if he didn't sign, the prosecution successfully positioned the lengthy ICE detention the petitioner faced as his own choice. This shaped the Court's perception adversely towards the petitioner. On the day of sentencing, the following exchange highlights that:

Mr. Sparling: "....*Following his sentence, Mr. Dikshit faces ICE detention for deportation*"

The Court: "*Isn't that his own choice*?" (referencing the letter the Court got from the prosecution citing the petitioner's refusal to sign)

While KLNF tried to explain the reasons for not signing the order, they did not mention how the order made him ineligible for FSA, changed nothing in terms of the length of his ICE detention etc. which was a highly

valid and justifiable argument. The Court was left with the impression that the lengthy ICE detention was the petitioner's choice and should not be considered when meting out the sentence.

Why did KLNF engage with prosecution on this discussion despite it clearly being detrimental to petitioner's case and being used by prosecution as a tool seeking a longer sentence? Why did KLNF not inform the petitioner about the implications on FSA? Why did KLNF keep insisting that the petitioner sign the order? It was because of the deference with which they treated the prosecution. It was because, as mentioned earlier, not a single time through the entirely of the case did the Counsel ever push back on a single argument, request, statement made by the prosecution even when these were flawed or detrimental to the petitioner.

Wouldn't a viable alternate strategy be to study the impact of signing such an order on the petitioner's case, his potential incarceration, and his subsequent ICE detention? To gather the facts based on even this preliminary research and then immediately share it with both prosecution and petitioner? To inform them about the impact of signing this order on the petitioner's eligibility for FSA and justifiably end the discussion?

Instead, without a moment's thought, Counsel, blinded by their implicit loyalty to the prosecution and their related professional interests, started insisting that the petitioner sign this order brought to them by the prosecution "as a great favor." This was influenced by the weight of the conflict that the Counsel operated under throughout the case.

**Point 3: Errors in sentencing memo effectively leaving petitioner with not a single valid argument or precedence supporting the sentence sought**

KLNF presented two examples supporting the non-custodial sentence sought in the petitioner's sentencing memo. The petitioner had also expressly stated that he is willing to seek home confinement, but Counsel did not consider this. The two examples they included in the memo were poorly researched and in one case completely erroneous. In U.S. v. Connelly, the judgement in question (presided over by this very Court) was overturned on appeal. Far worse, in *United States v. Canova*, 412 F.3d 331 (2d Cir. 2005), which KLNF presented as an example of a non-custodial sentence, the judgement was of a 5-month jail term followed by a 5-month home confinement on appeal, making this argument irrelevant and in fact, detrimental. KLNF mistakenly referenced this *United States v. Canova*, 412 F.3d 331 (2d Cir. 2005) as an example of precedence but had to send a rectification letter to the Court 3 business days before actual sentencing to highlight the mistake. This essentially left the petitioner with no supporting arguments for the sentence sought. This wasn't because no such arguments existed. Several similarly situated defendants had received non-custodial sentences including U.S. v. Cohen etc.

Bumbling on research, realizing mistakes so late as to not even have the time to correct them, not even attempting to replace the erroneous precedence cited with a valid one were all part of KLNF's half-hearted attempt at defense. On the day of the sentencing, the first thing the Court was presented by the defense was the letter acknowledging its error in stating precedence. This shaped the rest of the day too.

This sequence of events severely and adversely affected the defendant. KLNF spent hours trying to convince defendant to try to sign a Final Order of Removal instead of trying to research available valid arguments that would have actually strengthened the case. They made numerous errors and poor choices and demonstrated lack of understanding of petitioner's case and relevant precedents throughout their representation.

This was driven by an acknowledged or unacknowledged willingness to present a strong and forceful set of arguments to counter prosecution.

Wouldn't a viable alternative strategy be to actually include the valid legal precedents? Or to at least ask the Court for more time given acknowledged errors, to present an updated set of arguments? Either the Counsel chose not to do so to escape the admonishment they would likely receive from this Court that tends to have little patience with incompetence, or because they were half-hearted in the research intentionally.

While each of the above three points individually were clearly detrimental, the cumulative impact of these was materially worse. The Ninth Circuit has recognized cumulative impact of errors by counsel in evaluating prejudice under Strickland [*Turner v. Duncan* 158 F3d. 449, 457] "It is appropriate to consider the cumulative impact of errors when errors prevent the proper presentation of defense" [*Harris v. Wood*, 64 F3d. 1432, 1438-39]. Errors are also considered cumulatively prejudicial when Counsel is deficient in multiple ways [*Mak v. Blodgett*, 970 F 2d. 614, 622].

KLNF, due to intentional omissions and refusal to object to prosecutors' flawed and misleading statements (Point 1); by working hand in glove with prosecutor to facilitate strategies that were directly and obviously detrimental to petitioner's case (Point 2); and by either intentionally or unintentionally presenting flawed and deficient arguments that didn't support the sentence sought, allowed the prosecutor to influence the Court's perception of the offense conduct in a way that was materially detrimental to the sentencing outcome.

The Court, on the day of the sentencing, branded the defendant as a fraud and a thief. The Court, on the day of the sentencing, asked the defendant "*What were you thinking?"* expressing its amazement at the offense conduct. This was because the Court was never informed about the immediate remorse and the immediate

actions the defendant took. It wasn't presented with statements made and actions taken by the defendant that not only reflected his deep remorse but his strong desire to self-report and bring himself to justice. The Court was further given the perception that the petitioner would rather spend longer detention in ICE. Lastly, the Court was given no valid arguments to support any non-custodial sentence. All because the Counsel was acting under the weight of an undisclosed conflict, trying to protect a privileged relationship, trying to protect their own personal and professional interests, trying to ensure that they do not have to be confrontational with the son of their lead partner.

In the pre-sentencing report, the probation officer recommended a sentence of time served plus two years of probation, and a fine of $20,000 for the petitioner. This is indeed rare in such cases. However, the omissions and errors made by KLNF resulted in the Court getting an unfavorable, one-sided, and untrue perception of the petitioner and his offense conduct and his subsequent actions. On the day of the sentencing, the Court said "*I don't know what the probation was thinking.*" This was because the Court had not seen the complete and factual version of events and the prosecutors had successfully presented a flawed version of the events from the very start, facilitated by KLNF's unwillingness to stand up and push back.

These set of adverse actions made KLNF resulted in materially adverse outcomes. This is evidenced by the fact that as a percent of guideline range, the petitioner received one of the harshest, if not the harshest sentences ever meted out for insider trading since 2018 (as far back as the petitioner could research). This includes cases where offenders have millions of dollars in illicit profits in insider trading schemes running over multiple years. This is also not accounting for the harsher incarceration conditions faced by the petitioner, his lengthier detention due to ineligibility for home confinement or halfway house, and his potential deportation and ICE detention.

**To reiterate, actual conflict is no different from adverse impact and once a conflict of interest is proven, prejudice is presumed and there is no need to prove the second prong of the Strickland test. The facts above prove forcefully the adverse actions and impact and exceed the bar of the governing three-part standard by providing a preponderance of evidence.**

**The Court chose to hold the petitioner to a high standard and sentence him to 24 months as a deterrent. The petitioner now requests this Court to hold KLNF to the same high standard expected of petitioners and adjudicate on this actual conflict resulting from adverse actions by granting petitioner habeas relief.**