UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

PUNEET DIKSHIT,

        Petitioner,

    -against-

UNITED STATES OF AMERICA,

        Respondent.

------------------------------------------------------------------X

23 Civ. 3445 (CM)
21 Cr. 760 (CM)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 11/9/2023

## DECISION AND ORDER DENYING DEFENDANT'S MOTION TO VACATE, SET ASIDE, OR CORRECT HIS CONVICTION AND SENTENCE

McMahon, J.:

    Puneet Dikshit is currently serving a twenty-four months sentence for securities fraud. He is currently designated to the Residential Reentry Management field office in Atlanta, Georgia—his scheduled release date is June 29, 2024.

    Before the Court is Dikshit's *pro se* motion seeking to vacate or set aside his sentence pursuant to 28 U.S.C. § 2255. (Dkt. 53). He claims that his sentence should be vacated because there was "a patent and undisclosed conflict of interest between my law firm and [the] prosecutor as the lead partner of the law firm representing me is the father of the lead prosecutor," which purportedly "gave the lead prosecutor privileged access and influence over the law firm representing the petitioner." (*Id.* at 5, 18).

    For substantially the reasons set forth in Government's opposition papers, the motion is denied.

Background

This case arises from the Dikshit's misappropriation of material, non-public information ("MNPI") that he obtained as a result of his employment as a partner in McKinsey & Company, the global management consulting firm. Dikshit led McKinsey's unsecured lending practice in North America, advising lenders, acquirers, and networks relating to payments and consumer finance.

Between approximately November 2019 and July 2020, and again between approximately April and September 2021, The Goldman Sachs Group, Inc., the global investment bank, engaged McKinsey to provide consulting services in connection with Goldman Sachs' potential and actual acquisition of GreenSky, Inc., a financial technology company whose stock was publicly traded under the ticker "GSKY." McKinsey's work for Goldman Sachs included conducting due diligence on GreenSky and providing anticipated post-acquisition integration consulting services. The defendant was one of the lead McKinsey partners responsible for this engagement and had access to MNPI concerning the Goldman Sachs-GreenSky transaction, including that (a) Goldman Sachs was seeking to acquire GreenSky, (b) GreenSky had accepted Goldman Sachs' acquisition proposal on September 9, 2021, (c) Goldman Sachs had retained McKinsey on September 13, 2021, to help integrate GreenSky into the bank after the transaction closed, and (d) the transaction would be announced on a particular date, which was ultimately September 15, 2021.

Between July 26 and September 15, 2021—at the same time that he was leading the McKinsey team advising Goldman Sachs on the GreenSky acquisition—Dikshit misappropriated the MNPI to which he had access and used it, in violation of the duties that he owed to both Goldman Sachs and McKinsey, to trade unlawfully in GreenSky call options. At various times between July 26 and September 13, 2021, the Dikshit purchased and sold relatively small

numbers of GSKY call options, which had expiration dates weeks or months from the time of purchase. However, in the two days before the September 15, 2021 public announcement that Goldman Sachs would be acquiring GreenSky, he sold all of these longer-dated GSKY call options and purchased approximately 2,500 out-of-the money GSKY call options that were due to expire just a few days later, on September 17, 2021. After the deal was announced, the Dikshit sold these call options and realized illegal profits of approximately $450,000. He engaged in illegal transactions minutes after talking to his client Goldman Sachs, in both his and his wife's brokerage accounts and at times using his McKinsey-issued computer.

*Dikshit's Retention of Attorneys at Kramer Levin Naftalis & Frankel LLP*

On October 7, 2021—approximately one month prior to his arrest in this case—the petitioner spoke to an attorney, Steven S. Sparling, at the law firm Kramer Levin Naftalis & Frankel LLP ("Kramer Levin") regarding potential representation relating to the conduct giving rise to this prosecution. (Decl. of Steven S. Sparling (Dkt. 61 ("Sparling Decl.")) ¶ 4). Petitioner contacted the firm after searching the internet to learn who represented another McKinsey partner who committed insider trading (Rajat Gupta)—That attorney was Gary Naftalis, another partner at Kramer Levin; his name is on the firm's letterhead. (*Id.* ¶ 5; *see also* Compl. ¶ 15(cc); Presentence Investigation Report ¶ 56). However, Mr. Dikshit did not have any conversation with Mr. Naftalis; he was instead referred to Mr. Sparling.

By October 15, 2021, following multiple conversations with Dikshit, Mr. Sparling and his partner, Michael Martinez, advised Dikshit to self-report his conduct to the Securities and Exchange Commission ("SEC"). (Sparling Decl. ¶¶ 6-8; Declaration of Michael Martinez (Dkt. 61 ("Martinez Decl.")) ¶¶ 6-8). Over the course of the following approximately three weeks, Dikshit deliberated over whether to disclose his conduct voluntarily to the SEC, but still had not

done so at the time of his arrest, on November 10, 2021. (Sparling Decl. ¶¶ 7-10; Martinez Decl. ¶¶ 7-11).

According to Dikshit's former attorney's, after Dikshit's arrest, they learned that one of the Assistant United States Attorneys assigned to the case was Gary Naftalis's son. (Sparling Decl. ¶ 11; Martinez Decl. ¶ 11). Mr. Sparling and Mr. Martinez say that they discussed these circumstances with Dikshit, explaining that, if the he wished to continue to be represented by Mr. Sparling and Mr. Martinez, their law firm would erect "an ethical wall" and Gary Naftalis would have no involvement with his case. (Sparling Decl. ¶ 11; Martinez Decl. ¶ 12). Dikshit chose to proceed with representation by Mr. Sparling and Mr. Martinez, and counsel represent that Gary Naftalis had no involvement with the case. (Sparling Decl. ¶¶ 11-12; Martinez Decl. ¶¶ 11-12).

*The Guilty Plea and Sentencing*

On November 10, 2021, Dikshit was arrested, pursuant to a criminal Complaint that charged him with two counts of securities fraud, in violation of (i) 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2 ("Title 15 securities fraud"), and (ii) 18 U.S.C. §§ 1348 and 2 ("Title 18 securities fraud"). On December 15, 2021, Dikshit waived indictment and pled guilty, pursuant to a plea agreement, to a one-count Information that charged him with Title 15 securities fraud.

In advance of sentencing, Mr. Sparling and Mr. Martinez discussed with the petitioner the potential immigration consequences of his conviction and sentence. (Sparling Decl. ¶ 16; Martinez Decl. ¶ 17). Indeed, Messrs. Sparling and Martinez say that they included an immigration attorney in their discussions with Dikshit regarding the ramifications of consenting to a judicial order of removal, as proposed by the Government. (Sparling Decl. ¶¶ 17-18; Martinez Decl. ¶¶

18-19). Dikshit ultimately elected not to seek a judicial order of removal. (Sparling Decl. ¶ 18; Martinez Decl. ¶ 19).

Also prior to sentencing, Mr. Sparling and Mr. Martinez filed a lengthy sentencing submission, supported by a number of letters, containing advocacy on the Dikshit's behalf. (*See* Dkt. 17). The submission discussed, among other things, petitioner's personal life and good works, the collateral consequences of his conviction and sentence and, of course, his early acceptance of responsibility. (*See id.*). The submission also cited a number of judicial decisions as support for a below-Guidelines sentence—a sentence without a term of incarceration. (*See id.*). Following that submission, but prior to sentencing, Dikshit's attorneys filed a letter with the Court providing additional information regarding the procedural history of one of those cases. (Dkt. 19).

A sentencing proceeding was held on April 6, 2022. During that proceeding, Mr. Sparling immediately drew the Court's attention to the fact that Dikshit "pled guilty promptly" and "accepts full responsibility for his offense, and there is no question that he feels deep remorse for his offense." (Sentencing Tr. 8). Mr. Sparling proceeded to emphasize, among other things, Dikshit's character and personal circumstances, positive contributions to the community, and the collateral consequences he faced. (*Id.* at 8-13). When it was his turn to speak, Dikshit told the Court about "the guilt and remorse" he felt and stated, "What I did was wrong, and I'm profoundly sorry for it." (*Id.* at 17). After hearing from the parties, the Court imposed a sentence principally consisting of a term of imprisonment of 24 months. (*Id.* at 22).

*Post-Sentencing Proceedings*

On April 19, 2022, Dikshit filed a notice of appeal from the Court's April 6, 2022 judgment. (Dkt. 29). That appeal was dismissed on September 28, 2022, for failure to file a brief. (*See* Dkt. 47).

On August 3, 2022, Dikshit filed a *pro se* motion to "withdraw or otherwise set aside and vacate" his guilty plea "due to ineffective assistance of counsel" because his counsel allegedly "fail[ed] to inform defendant about the mandatory deportation he faced upon pleading guilty." (Dkt. 35 at 1). On October 20, 2022, the Court issued an order construing the motion as a petition pursuant to 28 U.S.C. § 2255 and denying it. (Dkt. 49).

On March 17, 2023, Dikshit filed a *pro se* motion with the Court of Appeals seeking to file a second or successive habeas petition so as to make yet another claim of ineffective assistance of counsel directed at his former attorneys, this time pointing to the purported conflict of interest that the defendant claims was not disclosed to him. On April 17, 2023, the Second Circuit issued an Order concluding that this petition was not successive and transferred the petition to the District Court for consideration as an initial petition. (*See* Dkt. 52). On May 30, 2023, the defendant filed an addendum to his petition. (Dkt. 56 ("Def.'s Add.")).

In the pending motion, Dikshit asserts that "the lead prosecutor [had] privileged access and influence over the law firm representing the petitioner." (Def.'s Mot. 17). Dikshit alleges that because of this "access and influence," Mr. Sparling and Mr. Martinez "[f]ailed to inform the Court about the near immediate actions he took to self report," "work[ed] with the prosecutor to pressure him to sign a Final Order of Removal" (which he in fact never did sign), and "[l]iterally [did] not includ[e] a single valid preceden[t] in the defense sentencing memo that supported the case for a non-custodial sentence." (*Id.* at 17-18; *see also* Def.'s Add. 5-12).

6

The Right to Conflict Free Representation

The Sixth Amendment provides a criminal defendant with the right to the effective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668 (1984). This "right to effective assistance of counsel includes the right to representation by conflict-free counsel." *United States v. Schwarz*, 283 F.3d 76, 90 (2d Cir. 2002) (internal quotation marks omitted).

The Second Circuit "group[s] attorney conflicts of interest into three general categories." *United States v. Williams*, 372 F.3d 96, 102 (2d Cir. 2004). "The first category describes those conflicts that are so severe that they are deemed *per se* violations of the Sixth Amendment," such as where "trial counsel is not authorized to practice law and where trial counsel is implicated in the same or closely related criminal conduct for which the defendant is on trial." *Id.* at 102-03 (internal quotation marks omitted). The second category consists of "actual conflict[s] of interest." *Id.* at 102 (emphasis omitted). "An attorney has an actual, as opposed to a potential, conflict of interest when, during the course of the representation, the attorney's and defendant's interests diverge with respect to a material factual or legal issue or to a course of action." *Schwarz*, 283 F.3d at 91 (internal quotation marks omitted). Finally, the third category consists of "potential conflict[s] of interest." *Williams*, 372 F.3d at 102 (emphasis omitted). An attorney has a potential conflict of interest if "the interests of the defendant may place the attorney under inconsistent duties at some time in the future." *Id.* (internal quotation marks omitted).

In order to prevail on a claim of an actual conflict of interest, a defendant must show more than just that counsel's interests diverged from the defendant's on some material legal or factual issue; that is, he must show more than just the mere existence of an actual conflict. *Schwarz*, 283 F.3d at 92 ("The finding of an actual conflict, however, is only the first step in determining whether [a defendant] has established his claim of ineffective assistance of counsel."). In addition, a

7

defendant "must also show that the actual conflict adversely affected [counsel's] performance by demonstrating that a lapse in representation resulted from the conflict." *Id.*; *see also, e.g., Triana v. United States*, 205 F.3d 36, 40-41 (2d Cir. 2000) (defendant must "show[ ] that counsel's interests diverged from the defendant's on some material legal or factual issue and resulted in an actual lapse in representation" (internal quotation marks omitted)).

To prove a lapse in representation is, in turn, a two-step process that requires "a defendant [to] demonstrate that some plausible alternative defense strategy or tactic might have been pursued, and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." *Schwarz*, 283 F.3d at 92 (internal quotation marks omitted); *see also Triana*, 205 F.3d at 41 ("Such a lapse of representation occurs when counsel, acting under a divided loyalty, forgoes some plausible alternative strategy of defense."). In other words, a defendant may not simply show that an alternative strategy was forgone, but must show that the alternative strategy was forgone because of the conflict. *See Williams*, 372 F.3d at 106 (defendant must show that "lapse in representation resulted from the conflict"); *Winkler v. Keane*, 7 F.3d 304, 309 (2d Cir. 1993) (same). However, once a defendant has shown that an alternative strategy was forgone as a result of counsel's actual conflict, he need not "show that the lapse in representation affected the outcome of the trial." *Schwarz*, 283 F.3d at 92. Rather, in such circumstances, "prejudice is presumed." *Id.* at 91.

### Dikshit's Ineffective Assistance of Counsel Claim is Without Merit

Dikshit claims that his attorneys acted under an "actual conflict of interest" occasioned by the fact that one of the prosecutors on the case was the son of a partner at the defendant's attorneys' firm, and that this actual conflict caused a lapse in representation. (*See* Def.'s Add. 4-12). Petitioner's claim is without merit. There was no actual conflict of interest in this case and,

8

even accepting, for the sake of argument, that there was such a conflict, it is clear that there was no lapse of representation, let alone one resulting from any purported conflict.

*There Was No Actual Conflict*

Dikshit argues that there was an actual conflict of interest between him and his attorneys due to the fact that the father of one of the prosecutors in this case was a partner at Kramer Levin. According to Dikshit, these circumstances demonstrate that his interests and his attorneys' interests diverged with respect to material factual or legal issues. But the New York Rules of Professional Conduct indicate otherwise. Under those Rules, the mere fact that a lawyer has a relative at a law firm is not viewed in the profession as creating any particular conflict issue unless the relative is actually involved in the case. *See, e.g.*, New York Rule of Professional Conduct ("RPC") 1.10(h). As noted above, Gary Naftalis had no involvement in this case, as was disclosed to the Dikshit when he consented to representation by Kramer Levin with full knowledge of the relationship between Gary and Joshua Naftalis. (Sparling Decl. ¶¶ 11-12; Martinez Decl. ¶¶ 11-12). To the extent Dikshit is asserting now that counsel are lying to the Court about having disclosed Naftalis issue and that he agreed to go forward with their representation, the Court rejects that assertion as wholly incredible. As the Court said about petitioner when rejecting his spurious claims against counsel in his first motion to vacate his conviction: "I find his counsel far more believable than a fraudster like the defendant." (Dkt. 49).

Dikshit advances no plausible basis on which to conclude that his interests and those of Messrs. Sparling and Martinez's diverged with respect to the sentence he received, whether the Court was made aware of petitioner's contemplation of self-reporting his crime, whether petitioner would consent to a judicial order of removal, or the efficacy of the defense sentencing submission. To take the last claim as an example, Dikshit now criticizes the cases on which Mr.

Sparling and Mr. Martinez chose to rely in their sentencing submission. (*See* Def.'s Add. 10-12). Setting aside whether the criticisms have any validity whatsoever, the notion that it was in counsels' interest to present unreliable precedents to this Court finds no support in fact or logic. And much the same can be said of the defendant's other arguments. At bottom, there is no support for the claim that it was in Mr. Sparling or Mr. Martinez's interest to perform poorly as attorneys in the hopes that their poor performance might make a prosecutor happy because that prosecutor's father was Mr. Sparling and Mr. Martinez's partner. Indeed, it is strange to suggest that it would please Mr. Naftalis to learn that his partners intentionally made mistakes on behalf of a paying client.

It is enough to say that the demonstrably capable advocacy that Mr. Sparling and Mr. Martinez provided on the defendant's behalf was the product of attorneys working with undivided loyalty, and there existed no conflict recognized by the law or otherwise.

*There Was No Lapse in Representation*

Even if there was some conflict of interest (which there was not) there was no lapse in representation.

Dikshit first contends that Mr. Sparling and Mr. Martinez should have emphasized at sentencing actions that he took to self-report his conduct prior to arrest, and that their failure to do so was a result of their desire to please the prosecutor. (Def.'s Add. 5-8). But the Dikshit's proposed alternative defense strategy was no strategy at all, because he did not in fact take action to self-disclose his conduct. To the contrary, as the declarations of Mr. Sparling and Mr. Martinez aver—and a close reading of Dikshit's own submissions suggest—the defendant elected not to disclose his misconduct to the SEC prior to his arrest. Mr. Sparling and Mr. Martinez encouraged the defendant on multiple occasions to do so, but he declined and instead

continued to deliberate as to how he wished to proceed. (*See* Sparling Decl. ¶¶ 7-10; Martinez Decl. ¶¶ 7-10).

There is no basis to think that the purported failure of Mr. Sparling and Mr. Martinez to inform the court that Dikshit had considered self-disclosure prior to arrest but did not do so was part of an effort to curry favor with the prosecutor.[1] The defendant's sentencing submission did discuss the defendant's early acceptance of responsibility, as did Mr. Sparling during sentencing. It would not have caused trouble for the prosecution if the Court had been told that the defendant thought about turning himself in earlier but did not do so. Finally, Dikshit himself had an opportunity to inform the Court of these facts when he spoke at sentencing and chose not to; there is no reason to think that the same decision not to raise these facts by his attorney constituted a lapse in representation.

Second, petitioner argues that Mr. Sparling and Mr. Martinez should have taken the position that agreeing to an order of removal was not a good idea, and therefore should not have encouraged him to reach such an agreement (which he did not do) or have engaged with the prosecution on the issue. Again, according to Dikshit, the failure to act in this manner was a result of Mr. Sparling's and Mr. Martinez's being "blinded by their implicit loyalty to the prosecution." (Dikshit's Add. 10). Setting aside the fact that it was perfectly reasonable advice to encourage an agreement to a final order of removal in an effort to avoid the possibility of a lengthy period of immigration detention (*see* Sparling Decl. ¶¶ 17-18; Martinez Decl. ¶¶ 18-19), petitioner's purported alternative defense strategy makes little sense. Had the defendant's attorneys simply refused to engage with the Government on this issue, the Government could and

---

[1] Had I known that defendant elected not to self-report, I might well have held it against him. Fortunately for Dikshit, his lawyers did not violate attorney-client privilege in order to apprise me of a fact that would not have stood him in good stead.

11

would have made the exact same points at sentencing on the matter and the Court would have reached the same conclusion. There was no benefit to petitioner for his attorneys not to explore and consider the issue.

Third, and finally, the defendant claims that Mr. Sparling and Mr. Martinez made errors in the sentencing submission and that those errors were a result of their conflict of interest. As noted above, and consistent with Dikshit's other arguments, this contention is nonsense. The sentencing submission was thorough and thoughtful; it advocated forcefully on the petitioner's behalf.

There was no lapse of representation, let alone one occasioned by any conflict.

The motion is denied—the petition is dismissed.

The Court declines to issue a certificate of appealability because there has been no "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see United States v. Perez*, 129 F.3d 255, 260 (2d Cir. 1997). Further, the Court finds, pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from an order denying Dikshit's motion would not be taken in good faith. *See Feliz v. United States*, No. 01-cv-5544, 2002 WL 1964347, at *7 (S.D.N.Y. Aug. 22, 2002).

Dated: November 9, 2023

District Court Judge